## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

LIBBY HILSENRATH, on behalf of
her minor child, C.H.,

       Plaintiff,

       v.

SCHOOL DISTRICT OF THE
CHATHAMS, BOARD OF EDUCATION
OF THE SCHOOL DISTRICT OF THE
CHATHAMS, MICHAEL LASUSA,
KAREN CHASE, JILL GIHORSKI,
STEVEN MAHER, MEGAN KEOWN,
and CHRISTINE JAKOWSKI,

       Defendants.

Civ. No. 18-00966 (KM) (MAH)

OPINION

**KEVIN MCNULTY, U.S.D.J.:**

       This case is an Establishment Clause challenge by Libby Hilsenrath, on behalf of her son C.H., to instruction about Islam in C.H.'s seventh-grade world cultures course. Before the Court are cross-motions for summary judgment. The motions raise certain threshold or technical issues of standing, arising from the passage of time and the school's voluntary withdrawal of certain of the curriculum materials, and also join issue on the merits. For the following reasons, Defendants' motion for summary judgment (DE 62) is **GRANTED**, and Hilsenrath's motion for summary judgment (DE 63) is **DENIED**.[1]

---

[1]     Certain citations to the record are abbreviated as follows:

    DE = docket entry

    Def. Brf. = Brief in Support of Defendants' Motion for Summary Judgment (DE 62-3)

    Def. SMF = Defendants' Statement of Material Facts (DE 62-2)

    Pl. Brf. = Brief in Support of Plaintiff's Motion for Summary Judgment (DE 63)

This well-framed case presented sensitive issues requiring factual inquiry and the balancing of multiple factors. No one's educational, ideological, or religious priors were sufficient to decide it. I understand well the strong feelings that accompany such issues and claims. I do not dismiss the plaintiff's concerns, and I am by no means unsympathetic with parents' desire to control their children's exposure to religious indoctrination. I am also acutely aware that this is public, not parochial, education. Religion, however, is a fact about the world, and no study of geography and cultures is complete without it. There is, to be sure, a line to be drawn between teaching about religion and teaching religion. On this record, I must conclude that the school did not cross that line.

_____

Def. Opp. = Defendants' Opposition to Plaintiff's Motion for Summary Judgment (DE 68-3)

Pl. Opp. = Plaintiff's Opposition to Defendants' Motion for Summary Judgment (DE 69)

Def. Reply = Reply Brief in Support of Defendants' Motion for Summary Judgment (DE 70)

Pl. Reply = Reply Brief in Support of Plaintiff's Motion for Summary Judgment (DE 71)

C.H. Dep. = C.H. Deposition Transcript, Exhibit F to Defendants' Motion for Summary Judgment (DE 62-10)

Jakowski Dep. = Christine Jakowski Deposition Transcript, Exhibit Y to Defendants' Motion for Summary Judgment (DE 62-29)

LaSusa Dep. = Michael LaSusa Deposition Transcript, Exhibit K to Defendants' Motion for Summary Judgment (62-15)

Weber Dep. = Jill Weber Deposition Transcript, Exhibit I to Defendants' Motion for Summary Judgment (DE 62-13)

Video 1 = Introduction to Islam Video, Exhibit 17 to Plaintiff's Motion for Summary Judgment, https://www.youtube.com/watch?v=ZHujiWd49l4 (DE 63-18)

Video 2 = 5 Pillars of Islam Video, Exhibit 18 to Plaintiff's Motion for Summary Judgment, https://www.youtube.com/watch?v=ikVGwzVg48c (DE 63-19)

Worksheet = Introduction to Islam Worksheet, Exhibit PP to Defendants' Motion for Summary Judgment (DE 62-46)

I.   **BACKGROUND**

A. **Facts**

1. **The World Cultures and Geography Course**

During the 2016–2017 school year, C.H. was a seventh-grade student at Chatham Middle School, in the School District of the Chathams. He was enrolled in a mandatory course called World Cultures and Geography, taught by defendants Megan Keown and Christine Jakowski. (Def. SMF ¶¶ 96–98, 125.)[2] The aim of the course was to "develop[] a broad understanding of the world and its people" so that "students will become active and informed global citizens." (DE 62-36, at 1.) To that end, the course devoted a unit of study to each of the world's major regions. (*Id.*) In learning about those regions, students learned about the religions commonly practiced in each and compared the religions. (*See, e.g.*, *id.*; DE 62-39.)

One unit was devoted to the Middle East and North Africa ("MENA"); and students learned about Islam, the prevalent religion in that region. (DE 62-41.) There were nine lessons as part of this unit (mostly on geography and current events), but Islam was only the focus of two. (*Id.*)

i.   *Introduction to Islam Video*

The first lesson was aimed at teaching students about generalizations through the lens of generalizations about Islam. (*Id.* at 2.) Ms. Jakowski presented a PowerPoint, and a copy was posted on Google Classroom, an online platform for teachers to provide students with access to course materials. (Jakowski Dep. at 29:8–18.) The last slide asked students to write down words they associated with Islam, watch a linked video introducing students to Islam ("Video 1"), and then discuss what generalizations they could make after watching the video and whether those generalizations were valid. (DE 62-42, at 10.) However, Ms. Jakowski did not play Video 1 in class and students were

---

[2]     Ms. Keown prepared the syllabus for the class and taught until November 2016, when she went on maternity leave. Ms. Jakowski replaced her and taught the unit at issue. (Def. SMF ¶¶ 96–98.)

not required to watch it as homework. (Jakowski Dep. at 30:21–31:1, 36:4–6, 45:11–19.) Nonetheless, C.H., with his mother, did access the presentation and Video 1 from Google Classroom and watched at home. (C.H. Dep. at 35:23–36:9.)[3]

Video 1 is a five-minute introduction to Islam. The video scrolls through pictures of Middle Eastern and North African peoples, Islamic art, and Muslim sites, with singing in the background.[4] Interspersed with these images for the first half of the video are slides of text asking and answering questions about Islam:

- "What is Islam? . . . Faith of divine guidance for Humanity, based on peace, spirituality and the oneness of God[.]" (Video 1 at 0:17.)

- "Who is Allah? Allah is the one God who created the heavens and the earth, who has no equal and is all powerful[.]" (*Id.* at 0:29.)

- "Who is Muhammed (S)? Muhammed (Peace be upon him) is the last & final Messenger of God, God gave him the Noble Quran[.]" (*Id.* at 1:01.)

- "What is the Noble Quran? Divine revelation sent to Muhammed (S) last Prophet of Allah. A Perfect guide for Humanity[.]" (*Id.* at 1:38.)

- "What does history say about Islam? Muslims created a tradition of unsurpassable splendor, scientific thought and timeless art[.]" (*Id.* at 2:10.)

Around the two-minute mark, the video begins to focus less on Islam as a religion *per se*, and more on the achievements of Islamic civilization. (*Id.* at

---

[3]     A study guide for the MENA unit advised students that the test would be open note, that their notes should include "general knowledge about [Islam] and 5 pillars," and that they should "[u]se slides on Google Classroom to ensure that you have all important information in your notes or on the handouts." (DE 63-14, at 1.)

[4]     On the YouTube page, the description from the video-creator states that the song playing in the background is "Qasida Burdah" and provides two links for download, but neither link seems to be currently active. Hilsenrath has provided what she attests is a translation of the song, which is religious in nature. (DE 63-17.) There is no testimony from C.H. that he clicked the links at the time of viewing the video or understood what the song, which was in Arabic, signified.

2:39, 3:02–25.) Also interspersed throughout the video are quotations (with attributions) from Muslim prayers, the Quran, and Muhammed. (*Id.* at 0:38, 1:14, 1:24, 1:48, 4:30, 4:19.) The video closes with a text slide stating, "May God help us all find the true faith, Islam. Ameen" (*id.* at 4:42), and another slide, seemingly from the video-creator, thanking his or her family and Allah (*id.* at 4:50).

C.H. later testified that he does not remember much about this video, and does not recall feeling coerced. (C.H. Dep. at 26:24–25:1, 37:3–11.)

### ii.   *Worksheet*

The second lesson further introduced students to the tenets of Islam. (DE 42, at 2.) Ms. Jakowski presented a second PowerPoint to the class that provided an overview of Islam's major characteristics and its five pillars, "the five obligations that every Muslim must satisfy in order to live a good and responsible life according to Islam." (DE 45, at 10.) As students listened to Ms. Jakowski's lesson, they were given a worksheet to complete that corresponded with the presentation. The worksheet had blanks which students would fill in, or incorrect statements which they would correct, based on information they learned. (Jakowski Dep. at 40:1–10.) The PowerPoint and worksheet covered a range of topics at a general level: for example, how often Muslims pray, the extent of alms giving, and why Muslims fast. (Worksheet at 3–5; DE 45, at 11–20.)

One slide and corresponding page of the worksheet concerned the pillar called *shahadah*, or "Testimony of Faith." (DE 45, at 10.) The *shahadah* is described as "[t]he basic statement of the Islamic faith," and the text of the *shahadah* was included in the PowerPoint. (*Id.* at 13.)[5] The worksheet

---

[5]      Hilsenrath contends that the PowerPoint and worksheet also contained a link to a webpage that teaches visitors how to convert to Islam and that students viewed it. (Pl. Brf. at 14.) There is indeed a link in both documents to an informational webpage from the BBC describing the *shahadah*. (DE 68-9, at 30, 42.) The webpage states, among other things, that "anyone who cannot recite [the *shahadah*] wholeheartedly is not a Muslim" and "[r]eciting this statement three times in front of witnesses is all that anyone need do to become a Muslim." *Shahadah: the statement of faith*, BBC,

contained an incomplete version of the *shahadah*, and students filled in the blanks of the statement: "There is no god but <u>Allah</u> and <u>Muhammad</u> is his messenger" (the underlined words reflect the parts of the statement which the students completed). (Worksheet at 3.) C.H. completed part of the worksheet, including the *shahadah* page. (C.H. Dep. at 36:1–9; DE 62-47.)[6]

### iii.    Five Pillars Video

Like the first presentation, the five-pillars presentation contained a link to a video ("Video 2") (DE 45, at 10), but Video 2 was not played in class or assigned as homework. (Jakowski Dep. at 36:4–6.) C.H. watched it at home with his mother. (C.H. Dep. at 35:23–36:9). Video 2 is five minutes long and opens with text stating that "the following is an Islamic educational presentation for primary and secondary schools." (Video 2 at 0:02 (capitalization altered).) Video 2 features two cartoon-animation boys, Alex and Yusuf, discussing Islam. Yusuf is Muslim, and Alex asks him questions about his religion. For example, Alex asks Yusuf when he prays and what Muslims believe (*Id.* at 0:50–2:00.) Yusuf states that "Allah is the creator of everything." (*Id.* at 1:30–34.) Yusuf then describes the five pillars to Alex and recites the *shahadah.* (*Id.* at 2:00–2:30.) Video 2 concludes with text instructing that the viewer can order more information from the video-creator, an organization called Discover Islam, and organize a mosque tour. (*Id.* at 5:20.) It is clear that

---

http://www.bbc.co.uk/religion/religions/islam/practices/shahadah.shtml (last updated Aug. 23, 2009). Besides Hilsenrath's own testimony (DE 63-2, at 129–30), however, there is no indication that Ms. Jakowski instructed students to follow links in the PowerPoints at home or that C.H. himself followed any such link. (*E.g.*, (Jakowski Dep. at 45:11–19.) As to the worksheet, Ms. Jakowski testified that the worksheet was provided in class, presumably in hard copy (*id.* at 40:1–3), and C.H. completed the worksheet by hand, so there is no indication that he followed any link (C.H. Dep. at 44:23–45:5; *see also* DE 62-47).

[6]      Ms. Jakowski described the worksheet as an in-class assignment, while C.H. stated that he could not recall whether he completed it at home or in class. (*Compare* Jakowski Dep. at 40:1–10, *with* C.H. Dep. at 45:8–9.) Fundamentally, however, it is undisputed that C.H. reviewed the PowerPoint and completed the worksheet as part of the course. (*See id.*)

Discover Islam is a United Kingdom organization because its website ends in "co.uk," the text of the video uses British spelling, and Yusuf and Alex speak with British accents.

### 2. **Hilsenrath's Complaints and Defendants' Response**

After watching the videos with C.H. and reviewing the worksheet, Hilsenrath felt that the curriculum favored Islam at the expense of Christianity and Judaism. So she sent emails expressing her concerns to (1) Steven Maher, Social Studies Content Supervisor for the School District; (2) Superintendent of Curriculum Karen Chase; (3) Superintendent Michael LaSusa; and (4) the Board of Education of the School District. (DE 62-48, 62-50.) It is important to understand the roles and responsibilities of each:

- Supervisor Maher develops the social studies curriculum and supervises the social studies teachers. (Def. SMF ¶¶ 85–88.)

- Assistant Superintendent Chase is responsible for oversight of the curriculum and Supervisor Maher. (*Id.* ¶ 78.)

- Superintendent LaSusa, under New Jersey law, is the "chief executive" of the District and has the power of "general supervision over all aspects, including . . . instructional programs, of the schools of the district." N.J. Stat. Ann. § 18A:17-20(b); *see also* Def. SMF ¶ 72. He oversees District policy regarding curriculum and course materials, and Assistant Superintendent Chase reports to him. (Weber Dep. at 20:1–21:1, 35:10–15, 54:13–16; La Susa Dep. at 9:22–25.) He also has the responsibility to "ensure that teachers follow" District policy that religion is treated neutrally. (DE 63-15.) Although the Board has the power to hire and fire the superintendent, the Board does not have the power to overrule him on decisions regarding instructional materials and curriculum. (Weber Dep. at 20:1–21:8.) Ultimately, it is his decision to remove materials from courses, a decision that does not require approval from the Board, and his determination is deemed to represent that of the Board and District. (*Id.* at 51:7–14, 57:7–11; LaSusa Dep. at 101:2–102:2.)

7

- The Board, under New Jersey law, is the "body corporate" that supervises the District. N.J. Stat. Ann. §§ 18A:10-1, 18A:11-1(c)–(d). It consists of nine members and requires five votes to take any action. (Weber Dep. at 34:9–10; *see also* N.J. Stat. Ann. § 18A:10-6.) Nonetheless, the superintendent retains final authority on most day-to-day matters involving the schools, including the curriculum, an area which the Board avoids. (Weber Dep. at 21:4–8.)

After sending emails, Hilsenrath attended a Board meeting in February 2017 and voiced her concerns. (Def. SMF ¶ 186.) In response, the Board's Curriculum Committee convened to discuss her complaints. (*Id.* ¶ 191.) When such complaints are raised, the Committee reviews and researches them and then presents findings and any recommendations to the Board publicly. (Weber Dep. at 19:7–25.) The Board usually does not take formal action regarding Committee recommendations but leaves that to the superintendent. (*Id.* at 20:1–21:8.) The Committee meeting included Superintendent LaSusa, Assistant Superintendent Chase, Supervisor Maher, social studies teacher Stephanie Lukasiewicz, Board Member Michelle Clark, and Board President Jill Weber. (Def. SMF ¶ 195; LaSusa Dep. at 93:25–94:1.)

After reviewing the curriculum and materials, Superintendent LaSusa and the Committee determined that no changes were necessary and presented their findings at the next Board meeting, emphasizing that the curriculum aligned with the District policy of religious neutrality. (DE 62-54, at 2–5; DE 62-5, at 24:1–14.) Prior to the meeting, however, Hilsenrath appeared on a national television show to voice her concerns, leading to threats from viewers directed at Board members, administrators, and teachers. (DE 62-54, at 2–3; DE 62-55.) Because of this disruption, Superintendent LaSusa and Supervisor Maher had the links to the videos removed from the PowerPoints. (*E.g.*, LaSusa Dep. at 87:6–18.)

**B. Procedural History**

Months later, when C.H. was in eighth grade and no longer in the World Cultures course, Hilsenrath sued the District, the Board, Superintendent LaSusa, Assistant Superintendent Chase, Principal Jill Gihorski, Supervisor Maher, and the two teachers, Ms. Keown and Ms. Jakowski. (Compl. ¶¶ 12–39.) Her claims against the individual defendants name them in their official capacities only. (*Id.* at 2.) She alleges one claim under 42 U.S.C. § 1983: that the curriculum, especially the videos and worksheet, violates the Establishment Clause of the First Amendment to the United States Constitution. (*Id.* ¶¶ 99–116.) She seeks (1) an injunction prohibiting Defendants "from funding and implementing religious instruction that endorses Islam or that favors Islam," (2) a declaration that Defendants violated her and C.H.'s rights under the Establishment Clause, (3) a declaration that Defendants' "training, supervision, policies, practices, customs, and procedures that promote Islam violate the Establishment Clause," (4) nominal damages, and (5) attorney's fees. (*Id.*, Prayer for Relief.)

Defendants moved to dismiss, but I denied the motion, holding that the Complaint on its face alleged an Establishment Clause claim. *Hilsenrath on behalf of C.H. v. Sch. Dist. of Chathams*, Civ. No. 18-966, 2018 WL 2980392, at *3–4 (D.N.J. June 13, 2018). Now, following discovery, the parties have cross-moved for summary judgment. C.H. is now in high school.

## II.   DISCUSSION AND ANALYSIS

To summarize, I hold as follows:

(1) Hilsenrath has standing to pursue a claim for nominal damages, but not for prospective injunctive or declaratory relief;

(2) The Board is a proper defendant, and Superintendent LaSusa's involvement in the curricular decisions is a policy sufficient to confer potential liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978);

(3) the claims against the individual defendants and the District will be dismissed; and

(4) the seventh grade World Cultures curriculum and materials did not violate the Establishment Clause.

## A. Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist).

When the parties file cross-motions for summary judgment, the governing standard "does not change." *Clevenger v. First Option Health Plan of N.J.*, 208 F. Supp. 2d 463, 468–69 (D.N.J. 2002) (citation omitted). The court must consider the motions independently. *Goldwell of N.J., Inc. v. KPSS, Inc.*, 622 F. Supp. 2d 168, 184 (D.N.J. 2009). That one of the cross-motions is denied does not imply that the other must be granted. For each, "the court

construes facts and draws inferences in favor of the party against whom the motion under consideration is made" but does not "weigh the evidence or make credibility determinations." *Pichler v. UNITE*, 542 F.3d 380, 386 (3d Cir. 2008) (internal quotation and citations omitted).

## B. Standing

I first must assess standing. *See Free Speech Coal., Inc. v. Att'y Gen. U.S.*, 974 F.3d 408, 421 (3d Cir. 2020). "To establish standing, a party must have '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *N.J. Dep't of Env't Prot. v. Am. Thermoplastics Corp.*, 974 F.3d 486, 493 (3d Cir. 2020) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)). Hilsenrath "has the burden of demonstrating that these requirements are met at the 'commencement of the litigation,' and must do so 'separately for each form of relief sought.'" *Freedom From Religion Found. Inc. v. New Kensington Arnold Sch. Dist.*, 832 F.3d 469, 476 (3d Cir. 2016) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)).

Of the standing trio, only the injury prong is at issue here. (*See* Def. Opp. at 7–13.) "Injury in fact requires 'the invasion of a concrete and particularized legally protected interest resulting in harm that is actual or imminent, not conjectural or hypothetical.'" *Sherwin-Williams Co. v. County of Delaware*, 968 F.3d 264, 268 (3d Cir. 2020) (quoting *Finkelman v. Nat'l Football League*, 810 F.3d 187, 193 (3d Cir. 2016)). Parents have a cognizable interest in "the conditions in their children's schools." *Donovan ex rel. Donovan v. Punxsutawney Area Sch. Bd.*, 336 F.3d 211, 217 n.2 (3d Cir. 2003). Accordingly, parents suffer an injury when a school's actions disfavor or favor religion. *E.g.*, *New Kensington*, 832 F.3d at 479 n.11. There is no dispute that Hilsenrath's allegations, if sustained, would entail some such injury. (Def. Opp. at 9.) Whether that injury confers standing, however, must be assessed in the context of the relief sought. *See New Kensington*, 832 F.3d at 476.

1. **Injunctive and Declaratory Relief Claims**

To seek injunctive or declaratory relief, Hilsenrath (personally and on behalf of C.H.) must show that she is either currently suffering the injury or will likely suffer the injury in the future. *Pa. Prison Soc'y v. Cortes*, 508 F.3d 156, 166 (3d Cir. 2007) (injunctive relief); *see Sherwin-Williams*, 968 F.3d at 269, 272 (declaratory relief); *St. Thomas-St. John Hotel & Tourism Ass'n, Inc. v. Gov't of U.S.V.I.*, 218 F.3d 232, 240 (3d Cir. 2000) (same). "[P]ast exposure to illegal conduct" is not enough. *McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 233 (3d Cir. 2012) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)). For example, in *City of Los Angeles v. Lyons*, the victim of a police chokehold sought to enjoin the department's chokehold policy. The Supreme Court held that he lacked standing to seek prospective relief because he could not show any likelihood that he would be choked again. 461 U.S. 95, 111 (1983).

Hilsenrath cannot show a current or future injury. C.H. is no longer in the course or even at the Middle School. He thus will not be "subjected" to the seventh-grade World Cultures curriculum again. Indeed, in the related context of mootness, courts have held that challenges to school policies or curriculum no longer present a live controversy when the student de-matriculates from the school. *Doremus v. Bd. of Educ. of Borough of Hawthorne*, 342 U.S. 429, 432–33 (1952) (Bible reading in class); *Donovan*, 336 F.3d at 216 (policy prohibiting Bible club); *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 73–74 (2d Cir. 2001) (various classroom activities and lesson plans); *Wood v. Bd. of Educ. of Charles Cnty.*, No. GJH-16-00239, 2016 WL 8669913, at *4 (D. Md. Sept. 30, 2016) (materials similar to those challenged here). Thus, Hilsenrath lacks standing to seek an injunction prohibiting Defendants from continuing the curriculum or a declaration that Defendants are violating the Establishment Clause. (*See* Compl., Prayer for Relief (b), (c).)[7]

---

[7]   Hilsenrath's requested relief includes enjoining Defendants from "funding" the curriculum at issue. (Compl., Prayer for Relief at (c).) In limited circumstances, the Supreme Court has recognized taxpayer standing to challenge Establishment Clause violations. *ACLU of N.J. v. Schundler*, 104 F.3d 1435, 1445 & n.9 (3d Cir. 1997).

To be sure, Hilsenrath also seeks a declaration that Defendants "violated" the Establishment Clause in the past. (*See id.* at (a).) Such a retrospective declaration, however, is not the endgame, but a "means" by which the plaintiff can obtain "some action (or cessation of action) by the defendant." *Hewitt v. Helms*, 482 U.S. 755, 761 (1987). Accordingly, plaintiffs lack standing to seek a declaration that past conduct was illegal when there is no prospect that such a declaration can be used to redress a current or future injury. *E.g.*, *Policastro v. Kontogiannis*, 262 F. App'x 429, 434 (3d Cir. 2008); *A.S. v. Harrison Twp. Bd. of Educ.*, 66 F. Supp. 3d 539, 548 (D.N.J. 2014); *A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*, 925 F.3d 1205, 1210–11 (11th Cir. 2019). Hilsenrath can show only a past injury: the instruction C.H., an eighth grader when the action was filed, received in seventh grade. She therefore lacks standing to seek declaratory relief.

Hilsenrath's arguments to the contrary are unpersuasive. First, she argues that C.H. "will again encounter the religion of Islam as a topic" in other courses he takes in high school. (Pl. Reply at 5.) There are several problems with this theory of standing. For starters, generally "encounter[ing]" Islam in a curriculum is not an injury. *Cf. Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 255 (1963) (explaining that schools can constitutionally teach children about religions); *New Kensington*, 832 F.3d at 480 (plaintiff was not injured by religious display when she did not understand, at first observance, that it endorsed a religion). Assuming Hilsenrath means that C.H. will be exposed to favoritism of Islam in later courses, that injury is too speculative. Future injuries must be "certainly impending" or there must be "a substantial

_____

Hilsenrath's briefs do not press such a theory. Regardless, such a theory fails here because "a municipal taxpayer plaintiff must show (1) that he pays taxes to the municipal entity, and (2) that more than a de minimis amount of tax revenue has been expended on the challenged practice itself." *Nichols v. City of Rehoboth Beach*, 836 F.3d 275, 281 (3d Cir. 2016) (citing *ACLU-NJ v. Township of Wall*, 246 F.3d 258, 262 (3d Cir. 2001) (Alito, J.)). Hilsenrath has made neither showing. Moreover, any expenditure on the instructional materials here would be de minimis. *See Township of Wall*, 246 F.3d at 262–63 (surveying cases challenging Bible reading in schools).

risk that the harm will occur." *New York v. Dep't of Commerce*, 139 S. Ct. 2551, 2565 (2019) (citation omitted). Evidence of past harms is insufficient—a plaintiff on summary judgment must produce affidavits or the like to show that she will face the harm. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992).

The course in which C.H. may again encounter Islam is eleventh-grade Advanced Placement World History. (DE 62-26, at 12.) There is no indication that C.H. will opt to enroll to that particular course, so any exposure is speculative. *See Roberts v. Madigan*, 921 F.3d 1047, 1052 (10th Cir. 1990) ("[S]tudents cannot claim First Amendment violations . . . for actions against a teacher in whose class they were not enrolled." (internal quotation marks and citations omitted)). Even if C.H. planned to enroll, teachers enjoy discretion in crafting their lessons (*e.g.*, DE 62-26, at 1), so there is no basis to predict whether Islam will be presented at all, and if so, whether such presentation will take a form that offends the Establishment Clause. *See COPE v. Kansas State Bd. of Educ.*, 921 F.3d 1215, 1222–23 (10th Cir. 2016) (no standing to challenge state educational standards when it was unclear how those standards would be implemented in the classroom). Thus, Hilsenrath's theory that C.H. will again be exposed to Islam in a constitutionally offensive context is too speculative.

All that aside, Hilsenrath cannot show that "the injury will be redressed by a favorable decision." *Laidlaw*, 528 U.S. at 181. The arguments and evidence in this case are focused on the seventh-grade course. Any injunction would need to be based on the facts and arguments she presented. *See Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (per curiam) ("Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents."); *see also, e.g.*, *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 206 (3d Cir. 2014). I would have no solid ground to enjoin the instruction of Islam in an eleventh-grade course when the case

before me has been focused on a different, seventh-grade course. Accordingly, a favorable decision could not redress any future injury that is posited.

Second, Hilsenrath argues that although Defendants removed the videos from the World Cultures course, it is uncertain whether Defendants will later reincorporate the videos into the course. (Pl. Reply at 7–10.) In so arguing, she relies on the voluntary cessation doctrine, which says that a claim is not moot when a defendant stops his illegal conduct *during litigation* unless it is clear that the behavior is not likely to recur. (*Id.* at 7 (citing *New Kensington*, 832 F.3d at 476).) The cessation in this case occurred before, not during, litigation. But in any event, the doctrine has no force here because it cannot serve "as a substitute for the allegation of present or threatened injury upon which initial standing must be based." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998). Put differently, that Defendants may use the videos in the future has no relevance because Hilsenrath cannot show that C.H. will ever again be in a course where the videos could be watched.[8]

Thus, Hilsenrath lacks standing to seek injunctive and declaratory relief, and to the extent her claims seek such relief, they will be dismissed.

    2.  **Nominal Damages Claim**

Hilsenrath also seeks nominal damages. (Compl., Prayer at (d).) Here, the standing analysis is different.

A plaintiff has standing to seek nominal damages for past Establishment Clause injuries. *New Kensington*, 832 F.3d at 480. That Hilsenrath cannot

---

[8]    Both parties confuse mootness and standing, with Defendants arguing that the removal of the videos mooted Hilsenrath's claims before the Complaint was filed, and Hilsenrath responding with the voluntary cessation doctrine. (Def. Opp. at 15; Pl. Reply at 7.) Standing requires showing that a live controversy exists at the outset of litigation, while mootness requires showing that a live controversy persists throughout litigation. *Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301, 305–06 (3d Cir. 2020). Because the removal of the videos occurred before litigation started, it could be analyzed in relation to the issue of standing. But it is not relevant because, regardless of whether the videos will be used in a seventh-grade world cultures course again, it is certain that C.H. will never again be in such a seventh-grade course.

show future injury is immaterial because damages offer retrospective relief. *Id.* at 478 n.7 (citing *Lyons*, 461 U.S. at 105). It stands to reason, then, that Hilsenrath would have standing to pursue a nominal-damages claim in relation to C.H.'s past exposure to the curriculum.

Neither the Third Circuit nor the Supreme Court has addressed whether a nominal-damages claim *alone* confers standing. In a concurring opinion in *New Kensington*, Chief Judge Smith expressed his view that the answer to that question should be no, because nominal damages do not truly provide redress for an injury. *Id.* at 483–84 (Smith, C.J., concurring).[9] A closely related issue is currently before the Supreme Court of the United States. In *Uzuegbunam v. Preczewski*, the Court will consider whether a government's post-filing cessation of an allegedly unconstitutional policy moots the case when only a nominal-damages claims is left. No. 19-968 (Brief for the Petitioners at 1).[10] The United States as *amicus* urges the Court to hold that a nominal-damages claim is sufficient to confer standing. *Id.* (Brief for the United States as Amicus Curiae Supporting Petitioners at 1, 9).

Although the issue is presently unsettled, I conclude that Hilsenrath's nominal-damages claim is sufficient to present a live controversy. No precedent bars such a holding. Nominal damages are available with respect to past Establishment Clause violations, *New Kensington*, 832 F.3d at 480 (majority op.), and damages claims ordinarily suffice to preserve a controversy even if prospective relief claims fail, *see Mission Prods. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1660 (2019). I therefore hold that the nominal-damages claim is sufficient to confer jurisdiction here.

---

[9]     The *New Kensington* panel did not need to address the question because at least one plaintiff had standing to seek injunctive relief. 832 F.3d at 481.

[10]    Three Justices have already indicated their view that a nominal-damages claim preserves a live controversy. *N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525, 1535 (2020) (Alito, J., joined by Gorsuch & Thomas, JJ.).

The *New Kensington* concurrence takes the view that nominal damages do not redress any injury because they provide no tangible benefit. *New Kensington*, 832 F.3d at 485 (Smith, C.J., concurring); *see also Morrison v. Bd. of Educ. of Boyd Cnty.*, 521 F.3d 602, 610–11 (6th Cir. 2008) (dicta); *Utah Animal Rights Coal. v. Salt Lake City Corp.*, 371 F.3d 1248, 1267–68 (10th Cir. 2004) (McConnell, J., concurring). The weight of authority, however, is against that view. Nominal damages reflect that the harm is non-quantifiable, not non-existent. 25 C.J.S. Damages § 24 (2020). Nominal damages still vindicate a plaintiff's rights, and their "value can be of great significance to the litigant and to society." *Amato v. City of Saratoga Springs*, 170 F.3d 311, 317 (2d Cir. 1999); *see also, e.g.*, *Carey v. Piphus*, 435 U.S. 247, 253, 266 (1978) (explaining that nominal damages "vindicat[e]" certain rights that cannot otherwise be quantified). Although a nominal-damages award is "not exactly a bonanza, [] it constitutes relief on the merits." *Farrar v. Hobby*, 506 U.S. 103, 116 (1992) (O'Connor, J., concurring). Given the well-supported view that nominal damages provide redress for a past injury, like Hilsenrath's here, I conclude that she has standing to pursue her nominal-damages claim, and that, to that extent, I have jurisdiction over the case.

## C. Theories of Liability

The next set of threshold issues requires the Court to identify the defendants against whom Hilsenrath can pursue an Establishment Clause violation and the theories of liability that are cognizable.

### 1. The Board and the District

In New Jersey, the terms "school board" and "school district" are often used interchangeably, but those entities do not have the same legal status. I rule that the Board, and not the District, is the proper defendant here.

School boards are the governmental entities which exercise the kind of powers at issue here. *See* N.J. Stat. Ann. § 18A:10-1 ("The schools of each school district shall be conducted, by and under the supervision of a board of education, which shall be a body corporate . . . ."). As such, school boards are

created as legal entities with the capacity to sue and be sued. *Id.* § 18A:11-2(a); *see also Febres v. Camden Bd. of Educ.*, 445 F.3d 227, 230 (3d Cir. 2006).

A school board may be subject to *Monell*-style municipal liability if its policy or custom caused the constitutional violation. *Mann v. Palmerton Area Sch. Dist.*, 872 F.3d 165, 174–75 (3d Cir. 2017). Policy can be shown if an official with final policymaking authority for the Board approved or ratified the curriculum and materials. *See McGreevy v. Stroup*, 413 F.3d 359, 367 (3d Cir. 2005). Such a showing requires me to "determine (1) whether, as a matter of state law, the official is responsible for making policy in the particular area of municipal business in question, and (2) whether the official's authority to make policy in that area is final and unreviewable." *Hill v. Borough of Kutztown*, 455 F.3d 225, 245 (3d Cir. 2006) (internal citations and emphases omitted). That inquiry involves "[r]eviewing the relevant legal materials, including state and local positive law, as well as 'custom or usage having the force of law.'" *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (quoting *City of St. Louis v. Praprotnik,* 485 U.S. 112, 124 n.1 (1988) (plurality)).

Superintendent LaSusa qualifies as an official with final policymaking authority. As to whether he is "responsible for making policy in the particular area of municipal business in question," *Hill*, 455 F.3d at 245, New Jersey law provides a positive answer. New Jersey grants superintendents "chief executive" status and power of "general supervision over all aspects, including . . . instructional programs, of the schools of the district." N.J. Stat. Ann. § 18A:17-20(b). The record, too, confirms that Superintendent LaSusa acts as the chief executive and is responsible for curriculum and academic programming decisions. (Weber Dep. at 20:1–21:1, 35:10–15, 54:13–16; LaSusa Dep. at 20:16–18.) What is more, the Board has specifically instructed him to ensure that teachers maintain religious neutrality (DE 63-15; LaSusa Dep. at 71:18–72:5, 73:1–4), "the particular area of municipal business in question" in this case, *Hill*, 455 F.3d at 245. His authority in these areas is "final and unreviewable," *id.*, because the Board cannot overrule him and, at

18

most, can require him to report to the Board regarding such issues. (Weber Dep. at 29:12–13, 35:10–15, 40:1–10, 54:13–16.)

Superintendent LaSusa also ratified the conduct at issue. "[W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality . . . ." *Prapotnik*, 485 U.S. at 127; *see also Kelly v. Borough of Carlisle*, 622 F.3d 248, 264 (3d Cir. 2010). Ms. Jakowski is a subordinate of Superintendent LaSusa, as he is at the top of her chain of command. (LaSusa Dep. at 9:17–25, 15:22–16:4.) As the final supervisor, he is "responsible for ensuring that [her] instruction meets appropriate standards" (*id.* at 23:1–5), including religious neutrality (*id.* at 73:1–4). Following Hilsenrath's complaints, he, along with others, reviewed the materials and determined that they comported with the religious neutrality policy and did not require removal; that determination represents the policy of the Board. (*Id.* at 94:20–95:4, 101:2–102:2; Weber Dep. at 51:7–14, 57:7–11.) Thus, Ms. Jakowski's lessons were subject to review by Superintendent LaSusa for compliance with policies (including the religious neutrality policy), and he approved those lessons going forward, so his "ratification" is "chargeable" to the Board under *Monell. Prapotnik*, 485 U.S. at 127; *see also McGreevy*, 413 F.3d at 368 ("[E]ven one decision by a school superintendent, if s/he were a final policymaker, would render his or her decision district policy.").[11]

---

[11]     Hilsenrath also argues that the Board is liable under *Monell* based on a failure-to-train theory. (Pl. Opp. at 10–13 (citing *Forrest v. Parry*, 930 F.3d 93, 118 (3d Cir. 2019).) Such a theory, however, will fail if she cannot establish a constitutional violation. *Vargas v. City of Philadelphia*, 783 F.3d 962, 974–75 (3d Cir. 2015). Because I conclude that she has one clearly viable *Monell* theory, I do not reach this alternative failure-to-train theory.

Both as a matter of state law and the *Monell* doctrine, the Board is the legal entity responsible for the decisions that are challenged here. It is a proper defendant.

School districts stand on a different footing. Unlike a school board, a school district is not created as a legal entity subject to suit. *Mesar v. Bound Brook Bd. of Educ.*, No. A-2953-16T2, 2018 WL 2027262 (N.J. Super. Ct. App. Div. May 2, 2018). In addition, the plaintiff here does not identify any basis for holding the District separately liable. I will therefore dismiss the remaining nominal-damages claims as against the District.

### 2. **The individual defendants**

I will also dismiss the remaining, nominal-damages claims against the individual defendants in their official capacities.

The Complaint seeks damages against "all the Defendants." (Compl., Prayer at (d).) Hilsenrath clarifies in her brief, however, that she is seeking nominal damages only against the Board and the District, not the individual defendants. (Pl. Reply Br. at 15.)[12] Accepting that concession, I find that the

---

[12]      In the motion-to-dismiss decision, I recognized that the individuals were probably included only as "relief defendants," *i.e.,* persons who might be required for the fashioning of effective injunctive relief. Even at the pleading stage, however, these defendants appeared to be superfluous. *See Hilsenrath*, 2018 WL 2980392, at *1 (citing *Kentucky v. Graham*, 473 U.S. 159, 166–67 & n.14 (1985) ("There is no longer a need to bring official-capacity actions against local government officials, for . . . local government units can be sued directly for damages and injunctive or declaratory relief.")).

Technically, the plaintiff's concession might be seen as an amendment of the complaint, which cannot generally be accomplished by means of statements in a brief. *See Jones v. Treece*, 774 F. App'x 65, 67 (3d Cir. 2019); *see also Commw. of Pa. ex rel Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988). There is some authority for the proposition that I may treat Hilsenrath's brief as a motion to amend, if Defendants consent or there would be no prejudice. *Ragland v. Comm'r N.J. Dep't of Corrs.*, 717 F. App'x 175, 178 n.6 (3d Cir. 2017) (per curiam); *Onal v. BP Amoco Corp.*, 275 F. Supp. 2d 650, 658 n.2 (E.D. Pa. 2003), *aff'd*, 134 F. App'x 515 (3d Cir. 2005). Here, the amendment is simply a concession that plaintiffs are relinquishing part of a claim, which they are generally entitled to do, and which does not prejudice any defendant. I therefore accept the concession.

dismissal of the claims for injunctive and declaratory relief on standing grounds, *see supra,* leaves no claims outstanding against the individual defendants.

In sum, I rule that the remaining claims for nominal damages are properly asserted against the Board, but not the District or the individual defendants.

### D. Merits of the Establishment Clause Claim

Finally, I turn to the underlying merits: whether the challenged materials and curriculum violate the Establishment Clause. I rule that they do not.

In some respects, the Establishment Clause test is in flux. The default test has long been that of *Lemon v. Kurtzman*, 403 U.S. 602 (1971), although the Supreme Court and Third Circuit have withheld its application in certain contexts, *Freedom From Religion Found., Inc. v. County of Lehigh*, 933 F.3d 275, 280–81 (3d Cir. 2019). Not so here, however: "In the public school context, the Supreme Court has been inclined to apply the *Lemon* test." *Doe v. Indian River Sch. Dist.*, 653 F.3d 256, 282 (3d Cir. 2011). *Lemon* imposes a three-part inquiry, asking "(1) whether the government practice had a secular purpose; (2) whether its principal or primary effect advanced or inhibited religion; and (3) whether it created an excessive entanglement of the government with religion." *Id.* (quoting *Lemon*, 403 U.S. at 612–13). In undertaking this inquiry, I analyze the challenged materials together and in the context of the curriculum. Context is critical; I therefore do not analyze whether any one page, slide, or statement is an Establishment Clause violation in and of itself. *See, e.g.*, *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 597 (1989), *abrogated on other grounds by Town of Greece v. Galloway*, 572 U.S. 565 (2014). Indeed, to "[f]ocus exclusively on the religious component of any activity would inevitably lead to [the activity's] invalidation." *Lynch v. Donnelly*, 465 U.S. 668, 679–80, (1984). *See also Wood v. Arnold*, 915 F.3d 308, 314 (4th Cir.) ("[C]ourts . . . consistently have examined the entire context surrounding the challenged practice, rather than only reviewing the contested portion."

(collecting cases from the Fourth, Fifth, Sixth, Seventh, Ninth, and Eleventh Circuits)), *cert. denied*, 140 S. Ct. 399 (2019).

1. **Secular Purpose**

Under the first *Lemon* prong, I ask whether there is "some secular purpose," even if it is not the exclusive purpose, for the government action, or whether, to the contrary, its "actual purpose is to endorse or disapprove of religion." *Doe*, 653 F.3d at 283 (citation omitted). In discerning the purpose of a government action, I view it from the perspective of an "objective observer" with knowledge of the context. *McCreary County v. ACLU of Ky.*, 545 U.S. 844, 862 (2005) (citation omitted).

The Board proffers that the purpose behind the materials and curriculum is to "assur[e] that our children are intellectually and socially prepared to become self-reliant members of 21st century society." (Def. Brf. at 45.) More specifically, the curriculum aims to educate students about the world's major religions, a mission which requires some exposure to their tenets and texts. (*Id.* at 45–46.) Educating students about religions, which requires exposure to religious texts, is a valid, secular purpose. *Stone v. Graham*, 449 U.S. 39, 42 (1980) ("[T]he Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like."); *Schempp*, 374 U.S. at 255 (explaining that "one's education is not complete without a study of comparative religion or the history of religion" and the Bible and religion can be studied "consistently with the First Amendment"). The Board's evidence consistently shows that the purpose in the lessons and instructional materials was merely educational, not to favor or disfavor a religion. (*E.g.*, DE 62-41, at 2–3 (lesson plan).) The Board's proffered purpose bears the hallmarks of being "genuine" and is therefore entitled to "deference." *McCreary*, 545 U.S. at 864.[13]

---

[13]     The genuineness of the government's purpose, of course, might present a triable issue of fact in a particular case. Here, however, discovery has failed to uncover

In response, Hilsenrath argues that there can be no secular purpose for exposing students to proselytizing content such as the *shahadah* or statements like "Allah is one the God." (Pl. Opp. at 16–17.) She gets off on the wrong foot, however, by asking the Court to analyze the purpose behind each statement she objects to. *See Lynch*, 465 U.S. at 679–80 (holding that, in a challenge to a Christmas display that included a crèche, the district court erred in "infer[ring] from the religious nature of the crèche that the City has no secular purpose for the display"); *see also Wood,* 915 F.3d at 314 (citing authorities). Of course, the statements of a religion's adherents have a religious purpose, *in the mouths of those adherents.* But for secular educators to teach and study *about* such statements is not to espouse them, or to proselytize.

The content to which Hilsenrath objects is closely tied to secular educational purposes. Video 1 was used to introduce students to the tenets of Islam. It employed quotations from the Quran and Muslim prayers, but there is no constitutional problem in using religious materials to study "history, civilization, . . . comparative religion, or the like." *Stone*, 449 U.S. at 42. Video 2 likewise explored Islam through a neutral question-and-answer format that could not be regarded as proselytizing. True, the worksheet contained fill-in-the-blanks questions, as is typical at the middle-school level. The format fell well short of compelled recitation of a prayer, however, and was clearly "designed to assess the students' understanding of the lesson on Islam," as the Fourth Circuit explained when upholding a similar worksheet against a First Amendment challenge. *Wood*, 915 F.3d at 315.

Thus, the Board had a valid, secular purpose in using its curriculum and instructional materials to educate students. Nothing in the discovery materials brought to the Court's attention bespeaks a proselytizing mission on behalf of the Islamic faith, and there is nothing in the record to indicate that the Board's purpose exceeded its educational mandate.

---

evidence of an underlying religious purpose. And the case law long ago established the principle that comparative religion is a legitimate subject of study.

2. **Primary Effect**

Under the second *Lemon* prong, I ask whether the primary *effect* of the government's practice is to advance or inhibit religion, regardless of any secular purpose. *Doe*, 653 F.3d at 284 (citation omitted). In doing so, I also consider the related endorsement test, which asks "whether, under the totality of the circumstances, the challenged practice conveys a message favoring or disfavoring religion," from "the viewpoint of the reasonable observer," considering "the history and ubiquity of the practice." *Id.* (citation omitted). The curriculum and materials do not have the primary effect of advancing Islam, and an observer would not perceive any endorsement. For that conclusion, I offer four reasons.

First, the curriculum treats Islam equally with other religions. It is not a standalone course of study, but is part of a larger survey of world regions and religions, so there is no impermissible favoritism. Generally, in curriculum cases, a school's presentation of multiple religious materials or presentation of religious material in conjunction with nonreligious material tends to demonstrate that the primary effect of the curriculum is not to advance any one religion. *See Cal. Parents for Equalization of Educ. Materials v. Torlakson*, 370 F. Supp. 3d 1057, 1081–82 (N.D. Cal. 2019) (surveying cases), *aff'd*, 973 F.3d 1010 (9th Cir. 2020). Here, the World Cultures course includes similar units on, for example, Hinduism and Buddhism, in which students watch videos on those religions to understand their tenets and practices. (DE 62-39, at 4, 8–11; DE 68-8.) A reasonable observer would not perceive an endorsement of Islam when the course also presented other religions in a similar manner. Further, Islam is introduced as part of a unit on the Middle East and North Africa in a course covering geography and world cultures, so it is presented in conjunction with nonreligious material about a region of the world.

Second, a reasonable observer would see that the curriculum and materials are presented as part of an academic exercise. When schools require

students to "read, discuss, and think" about a religion, such lessons do not
have the primary effect of advancing that religion. *Wood*, 915 F.3d at 317; *see
also Torlakson*, 973 F.3d at 1021; *Brown v. Woodland Joint Unified Sch. Dist.*,
27 F.3d 1373, 1380 (9th Cir. 1994). Reasonable observers understand that
students are simply learning to "identify the views of a particular religion," not
to follow the religion. *Wood*, 915 F.3d at 317; *see also Torlakson*, 973 F.3d at
1021 (curriculum did not have primary effect when it did not "call for the
teaching of biblical events or figures as historical fact").

Here, the videos, lessons, and worksheet presented students with the
tenets of Islam. This case falls into the category of those in which schools
permissibly asked students to "read, discuss, and think" about a religion.
*Wood*, 915 F.3d at 317. True, Video 1 is from the perspective of a believer, but
a reasonable observer would understand that the video is not presented as
representing the views of the teacher or the school; nor is there any indication
that it was presented in a manner to suggest that students should accept the
video-creator's views as revealed religious truth.[14] Rather, Video 1 was assigned
to introduce students to the tenets of Islam. Although the video-creator can be
perceived as believing those tenets, neither the lesson, Ms. Jakowski, nor even
the video-creator invites or encourages the students to adopt those views. This
is par for the course; to take the Ninth Circuit's cogent example, "Luther's
'Ninety-Nine Theses' are hardly balanced or objective, yet their pronounced and
even vehement bias does not prevent their study in a history class' exploration
of the Protestant Reformation, nor is Protestantism itself 'advanced' thereby."

---

[14]    Relatedly, Hilsenrath argues that because the videos on Hinduism and
Buddhism are from the perspective of a more neutral narrator, the World Cultures
course does not treat all religions equally and proselytizes when it comes to Islam. (Pl.
Reply at 3.) As discussed above, there is no problem with Video 1's presentation.
Moreover, "Plaintiffs' efforts to wring an Establishment Clause violation from subtle
differences that they perceive in the curricular treatment of various religions does not
withstand scrutiny, and, if accepted, would paralyze educators in their lawful objective
of treating religion as a topic relevant to world history." *Torlakson*, 973 F.3d at 1022
(Bress, J., concurring).

*Brown*, 27 F.3d at 1380 (citation omitted). When, as here, religious beliefs are presented to educate, not convert, students, there is no endorsement of religion.[15]

Third, the curriculum and materials did not require or even propose that the students engage in religious activity. Courts weigh whether the school requires or invites students to partake in a religious activity. *E.g.*, *Wood*, 915 F.3d at 317; *Brown*, 27 F.3d at 1380; *Doe*, 653 F.3d at 284. For example, in *Malnak v. Yogi*, the Third Circuit held that a class about a religion crossed the line when students were required to participate in a religious ceremony. 592 F.2d 197, 199 (3d Cir. 1979) (per curiam). In contrast, here, C.H. passively watched two informational videos. As to the worksheet, "students were not required to memorize the *shahada*, to recite it, or even to write the complete statement of faith. Instead, the worksheet included a variety of factual information related to Islam and merely asked the students to demonstrate their understanding of the material by completing the partial sentences. This is

---

[15]  Hilsenrath makes much of the facts that (1) Video 2 ended with information about scheduling a tour of a mosque and (2) one of the PowerPoints and a worksheet contained a link to a BBC webpage that allegedly teaches visitors how to convert to Islam. (Pl. Brf. at 19; Pl. Opp. at 4; Pl. Reply at 14–15.)

First, as a general matter, information about how students—independently and on their own time—can visit a house of worship to learn more about a religion is not *per se* objectionable. I add that Video 2, made by a United Kingdom company, suggested a mosque tour under the heading "Discover Islam UK,", so there is little realistic possibility that a New Jersey seventh-grader would take up the offer, if that is what it was.

Second, there is no indication that C.H. or any student actually followed the link to the BBC webpage, *supra* note 5, so that link is not central to my inquiry. Regardless, the webpage is informational, and a reasonable observer would not view the BBC, a public service broadcaster, as evangelizing for a particular faith. The objection appears to be to a statement on this third-party website that "[r]eciting [the *shahadah*] three times in front of witnesses is all that anyone need do to become a Muslim." That statement, however, is factual, and would not reasonably be taken as the school's invitation to convert. No more would a factual statement, in a unit on Christianity, that Christian sects regard infant or adult baptism as the faith's rite of admission or adoption.

precisely the sort of academic exercise that the Supreme Court has indicated
would not run afoul of the Establishment Clause." *Wood*, 915 F.3d at 316
(citing *Schempp*, 374 U.S. at 225, and analyzing the same worksheet
challenged here). The curriculum never progressed from the academic to the
liturgical, and it did not have the primary effect of advancing religion.

      Fourth, a few miscellaneous facts about the larger context also cut
against any holding that the primary effect here was to advance Islam: (1) The
course was given to seventh-grade students, who are considered less
impressionable than elementary school students, as to whom First Amendment
concerns are perhaps more acute. Adolescents are equipped to, and
proverbially do, exercise some independent judgment with respect to what they
are told by adults. *See Parker v. Hurley*, 514 F.3d 87, 106 (1st Cir. 2008);
*Fleischfresser v. Dirs. of Sch. Dist. 200*, 15 F.3d 680, 686 (7th Cir. 1994); *cf.
Busch v. Marple Newtown Sch. Dist.*, 567 F.3d 89, 95–96 (3d Cir. 2008).
(2) Islam occupied only two lessons within a yearlong course, so objective
observers would be less likely to perceive an endorsement of Islam. *Wood*, 915
F.3d at 317–18; *Brown*, 27 F.3d at 1380. (3) The curriculum was designed not
just to educate to students about Islam but also to teach them valuable lessons
about uncritical acceptance of cultural generalizations. *See Fleischfresser*, 15
F.3d at 689 (reading program that used witchcraft as the subject of stories did
not have the primary effect of advancing witchcraft because the primary effect
of the lesson was to "improv[e] [] reading skills and to develop imagination and
creativity"). And (4) many American students learn about world religions,
including but hardly limited to Islam, as shown in cases like *Wood.* A
reasonable observer considering the "history and ubiquity of the practice"
would understand that such lessons here are part of a common academic
program. *See Doe*, 653 F.3d at 284. These facts further weigh in favor of my

conclusion that these lessons did not run afoul of the second, "effects" prong of *Lemon*.[16]

### 3. **Excessive Entanglement**

Under the third *Lemon* prong, I ask whether the challenged practices "foster an excessive government entanglement with religion." *Doe*, 653 F.3d at 288 (quoting *Lemon*, 403 U.S. at 613). I analyze how the challenged practices create a "relationship between the government and religious authority," but "excessive entanglement requires more than mere interaction between church and state, for some level of interaction has always been tolerated." *Id.* (internal quotation marks, citations, and alterations omitted). In cases involving curriculum or programs at schools, courts have looked to whether the school works with religious entities to create the curriculum and whether the school must constantly monitor the activities to ensure no endorsement of religion. *See Stratechuk v. Bd. of Educ., S. Orange-Maplewood Sch. Dist.*, 587 F.3d 597, 608 (3d Cir. 2009); *Wood*, 915 F.3d at 318; *Brown*, 27 F.3d at 1384; *Fleischfresser*, 15 F.3d at 688.

Here, there is not even evidence of "mere interaction between church and state." *Doe*, 653 F.3d at 288 (citation omitted). Teachers and Supervisor Maher created the lesson plans, and there is no indication that they worked with any religious organization in doing so. (Def. SMF ¶¶ 154–55.)[17] Absent the rare

---

[16]    It is worth pointing out that C.H. never felt coerced, and, in fact perceived the purpose and effect of the lessons as to educate students about world religions and the importance of avoiding group generalizations. (C.H. Dep. at 24:18–25:1, 40:8–24, 41:22–25.) Still, it is not necessarily significant that one student or another is mature and independent-minded; *Lemon*'s second prong is an objective inquiry, not an evaluation of each student's response.

[17]    This is not to say that working with a religious organization to develop an accurate and respectful curriculum should qualify as excessive entanglement. *See Doe*, 653 F.3d at 288 (government interaction with religious organizations is not *per se* excessive entanglement). And even if it did, "entanglement, standing alone, will not render an action unconstitutional if the action does not have the overall effect of advancing, endorsing, or disapproving of religion." *ACLU of N.J. ex rel Lander v. Schundler*, 168 F.3d 92, 97 (3d Cir. 1999). Be that as it may, this case does present

parent complaint, the teachers are left alone to implement the lessons themselves, so there is no need to entangle the Board in continual surveillance of the classroom. *See Brown*, 27 F.3d at 1384.

Hilsenrath cites *Doe*, in which school board members composed and recited prayers at meetings. 653 F.3d at 288. Both *Doe* and this case, she urges, involve excessive entanglement because the incorporate religion as part of a "formal activity" (there, board meetings; here, the required classroom curriculum). (Pl. Opp. at 22–23.) The "effects" analysis, *see* Section II.D.2, *supra*, largely disposes of that argument. *See Child Evangelism Fellowship of N.J. Inc. v. Stafford Twp. Sch. Dist.*, 386 F.3d 514, 534 (3d Cir. 2004) (Alito, J.) ("[T]he factors employed to assess whether an entanglement is excessive are similar to the factors used to examine effect." (internal quotation marks, citation, and alterations omitted)); *ACLU of N.J. ex rel Lander v. Schundler*, 168 F.3d 92, 97 (3d Cir. 1999) (explaining that the Supreme Court has sometimes collapsed the effects and entanglement prongs). Moreover, there is little similarity between *Doe* and this case. In *Doe*, the Third Circuit found entanglement because the board formally participated in a religious activity by composing and reciting prayers at meetings, "hallmarks of state involvement." 653 F.3d at 288. But, as explained above, there is no religious activity here, only factual presentation of the tenets of a religion for academic study. Absent evidence of more direct involvement with a religious entity, a school does not entangle itself religion simply by teaching it as part of a broader, balanced curriculum, even if curriculum development or teaching could be considered a "formal" state activity.

* * *

In sum, the curriculum and materials here survive scrutiny under each of the three *Lemon* prongs. Accordingly, the Board did not violate the

---

*any* "level of interaction" between a school and a religious organization. *Doe*, 653 F.3d at 288 (citation omitted).

Establishment Clause. I will enter summary judgment in the Board's favor on Hilsenrath's remaining nominal-damages claim.

## III.   CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is granted and Hilsenrath's motion for summary judgment is denied. To recap, Hilsenrath's claims for injunctive and declaratory relief against all Defendants fail for lack of standing, but her nominal-damages claims may proceed. The nominal damages claims are properly asserted against the Board, which is an entity with the capacity to be sued, and which is potentially liable under a *Monell* theory. The claims are dismissed, however, as against the District and the individual defendants. As to the remaining, nominal-damages claim against the Board, summary judgment is granted, and the claim is dismissed, because the curriculum and materials satisfy the *Lemon* test and do not violate the Establishment Clause.

A separate order will issue.

Dated: November 12, 2020

/s/ Kevin McNulty

_____

**Hon. Kevin McNulty**
**United States District Judge**