# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

LIBBY HILSENRATH, on behalf of
her minor child, C.H.,

       Plaintiff,

       v.

SCHOOL DISTRICT OF THE
CHATHAMS, BOARD OF EDUCATION
OF THE SCHOOL DISTRICT OF THE
CHATHAMS, MICHAEL LASUSA,
KAREN CHASE, JILL GIHORSKI,
STEVEN MAHER, MEGAN KEOWN,
and CHRISTINE JAKOWSKI,

       Defendants.

Civ. No. 18-00966 (KM) (MAH)

**SUPPLEMENTAL OPINION
ON REMAND**

**KEVIN MCNULTY, U.S.D.J.:**

       This case is an Establishment Clause challenge brought by Libby Hilsenrath on behalf of her son, C.H.,[1] to instruction about Islam in C.H.'s seventh-grade World Cultures and Geography course in the Chatham public schools. On November 12, 2020, this Court granted Defendants' motion for summary judgment and denied Hilsenrath's cross-motion for summary judgment, holding as follows:

       (1) Hilsenrath has standing to pursue a claim for nominal damages, but not for prospective injunctive or declaratory relief;

       (2) the School Board for the School District of the District of the Chathams (the "Board") is a proper defendant, and Superintendent LaSusa's involvement in the curricular decisions is sufficient to trigger potential liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978);

---

[1]     The identity of C.H., the minor child on whose behalf Ms. Hilsenrath sues, is properly anonymized.

(3) the claims against the individual defendants and the School District of the Chathams (the "District") must be dismissed; and

(4) the seventh-grade World Cultures and Geography curriculum and materials did not violate the Establishment Clause.

On July 20, 2022, following an appeal by Hilsenrath, the Third Circuit vacated this Court's judgment and remanded the case "for further consideration in light of the Supreme Court's opinion in *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (June 27, 2022)." (DE 87.) That case, decided after I rendered my decision, bears on the proper test that should be applied in analyzing Hilsenrath's Establishment Clause claims.

Again before the Court on remand are Defendants' motion for summary judgment (DE 62) and Hilsenrath's cross-motion for summary judgment (DE 63). At the Court's invitation, each side filed a supplemental brief on remand. (DE 99, 100 (as corrected).) What follows amounts to an amendment of my prior decision, revised in accordance with *Kennedy v. Bremerton* and the parties' supplemental briefing. It should be read, *mutatis mutandis*, against the backdrop of the fuller discussion in my earlier decision. For the following reasons, Defendants' motion for summary judgment is again **GRANTED**, and Hilsenrath's motion for summary judgment is **DENIED**.[2]

---

[2] My previous Opinion's prefatory note regarding the delicate nature of the issues raised by this case bears repeating here:

> This well-framed case presented sensitive issues requiring factual inquiry and . . . [n]o one's educational, ideological, or religious priors were sufficient to decide it. I understand well the strong feelings that accompany such issues and claims. I do not dismiss the plaintiff's concerns, and I am by no means unsympathetic with parents' desire to control their children's exposure to religious indoctrination. I am also acutely aware that this is public, not parochial, education. Religion, however, is a fact about the world, and no study of geography and cultures is complete without it. There is, to be sure, a line to be drawn between teaching about religion and teaching religion. On this record, I must conclude that the school did not cross that line.

(500 F. Supp. 3d at 277–78, SJ Op. at 2.)

## I.   BACKGROUND[3]

### A. Facts

#### 1. The World Cultures and Geography Course

During the 2016–2017 school year, C.H. was a seventh-grade student at Chatham Middle School, in the School District of the Chathams. He was

---

[3]   Certain citations to the record are abbreviated as follows:

DE = Docket entry number in this case

Compl. = Complaint (DE 1)

Def. SMF = Defendants' Statement of Material Facts (DE 62-2)

C.H. Dep. = C.H. Deposition Transcript, Exhibit F to Defendants' Motion for Summary Judgment (DE 62-10)

Jakowski Dep. = Christine Jakowski Deposition Transcript, Exhibit Y to Defendants' Motion for Summary Judgment (DE 62-29)

LaSusa Dep. = Michael LaSusa Deposition Transcript, Exhibit K to Defendants' Motion for Summary Judgment (62-15)

Weber Dep. = Jill Weber Deposition Transcript, Exhibit I to Defendants' Motion for Summary Judgment (DE 62-13)

Video 1 = Introduction to Islam Video, Exhibit 17 to Plaintiff's Motion for Summary Judgment, https://www.youtube.com/watch?v=ZHujiWd49l4 (DE 63-18)

Video 2 = 5 Pillars of Islam Video, Exhibit 18 to Plaintiff's Motion for Summary Judgment, https://www.youtube.com/watch?v=ikVGwzVg48c (DE 63-19)

Worksheet = Introduction to Islam Worksheet, Exhibit PP to Defendants' Motion for Summary Judgment (DE 62-46)

SJ Op. = November 20, 2020 Opinion granting Defendants' motion for summary judgment and denying Plaintiff's cross-motion for summary judgment (DE 82). The published version of this Opinion can be found at *Hilsenrath on behalf of C.H. v. Sch. Dist. of Chathams*, 500 F. Supp. 3d 272 (D.N.J. 2020).

Pl. Br. = Plaintiff's Supplemental Brief in Support of Summary Judgment after the Third Circuit's Order to Vacate and Remand (DE 99)

Def. Br. = Supplemental Brief in Further Support of Defendants' Motion for Summary Judgment on Remand from the Third Circuit (DE 100)

enrolled in a mandatory course called World Cultures and Geography, taught by defendants Megan Keown and Christine Jakowski. (Def. SMF ¶¶ 96–98, 125.)[4] The aim of the course was to "develop[] a broad understanding of the world and its people" so that "students will become active and informed global citizens." (DE 62-36 at 1.) To that end, the course devoted a unit of study to each of the world's major geographic regions. (*Id.*) As part of the study of each region, students learned about the religions commonly practiced in each. (*See, e.g.*, *id.*; DE 62-39.)

One unit was devoted to the Middle East and North Africa ("MENA"). As part of that unit, students learned about Islam, the religion that is prevalent in that region and is a central component of many of those countries' governments, laws, and cultures.[5] (DE 62-41.) This particular unit comprised nine lessons. Most covered geography and current events, but two of the nine focused on Islam. (*Id.*)

### (a)   *Introduction to Islam* Video

The first lesson was aimed at teaching students about the general attributes of the Islamic faith. (*Id.* at 2.) Ms. Jakowski presented a PowerPoint, a copy of which was posted on Google Classroom, an online platform for teachers to post course materials for their students. (Jakowski Dep. at 29:8–18.) The last of the PowerPoint slides asked students to write down words they associated with Islam, to watch a linked video introducing students to Islam ("Video 1"), and then to discuss what generalizations they could make after watching the video and consider whether those generalizations were valid. (DE 62-42 at 11.) However, Ms. Jakowski did not play Video 1 in class and

---

[4]   Ms. Keown prepared the syllabus for the class and taught until November 2016, when she went on maternity leave. Ms. Jakowski replaced her and taught the unit at issue. (Def. SMF ¶¶ 96–98.)

[5]   To put it another way, these students are citizens of a country which prohibits establishment of an official religion, but in this unit they were studying countries which emphatically do not. It is impossible to study the government and culture of, for example, the Islamic Republic of Iran while avoiding exposure to the tenets of Islam.

students were not required to watch it as homework. (Jakowski Dep. at 30:21–31:1, 36:4–6, 45:11–19.) Nonetheless, C.H., with his mother, did access the presentation and Video 1 from Google Classroom and watched it at home. (C.H. Dep. at 35:23–36:9.)[6]

Video 1 is a five-minute introduction to Islam. The video scrolls through pictures of Middle Eastern and North African peoples, Islamic art, and Muslim sites, with singing in the background.[7] Interspersed with these images for the first half of the video are slides of text asking and answering questions about Islam:

- "What is Islam? . . . Faith of divine guidance for Humanity, based on peace, spirituality and the oneness of God[.]" (Video 1 at 0:17.)

- "Who is Allah? Allah is the one God who created the heavens and the earth, who has no equal and is all powerful[.]" (*Id.* at 0:29.)

- "Who is Muhammed (S)? Muhammed (Peace be upon him) is the last & final Messenger of God. God gave him the Noble Quran[.]" (*Id.* at 1:01.)

- "What is the Noble Quran? Divine revelation sent to Muhammed (S) last Prophet of Allah. A Perfect guide for Humanity[.]" (*Id.* at 1:38.)

- "What does history say about Islam? Muslims created a tradition of unsurpassable splendor, scientific thought and timeless art[.]" (*Id.* at 2:10.)

Around the two-minute mark, the video begins to focus less on Islam as a religion *per se*, and more on the achievements of Islamic civilization. (*Id.* at

---

[6]     A study guide for the MENA unit advised students that the test would be open note, that their notes should include "general knowledge about [Islam] and 5 Pillars," and that they should "[u]se slides on Google Classroom to ensure that you have all important information in your notes or on the handouts." (DE 63-14 at 2.)

[7]     On the YouTube page, the description from the video-creator states that the music playing in the background is "Qasida Burdah" and provides two links for download, but neither link seems to be currently active. Hilsenrath has provided what she attests is a translation of the text of the song, which is religious in nature. (DE 63-17.) There is no testimony from C.H. that he clicked the links at the time of viewing the video or understood what the song, which was in Arabic, signified.

2:39, 3:02–25.) Also interspersed throughout the video are quotations (with attributions) from Muslim prayers, the Quran, and Muhammed. (*Id.* at 0:38, 1:14, 1:24, 1:48, 4:30, 4:19.) The video closes with a text slide stating, "May God help us all find the true faith, Islam. Ameen" (*id.* at 4:42), and another slide, seemingly from the video-creator, thanking family members and Allah (*id.* at 4:50).

In his deposition, C.H. testified that he did not remember much about this video, and did not recall feeling coerced. (C.H. Dep. at 24:24–25:1, 37:3–11.) That, of course, is relevant but not dispositive.

### (b)  Worksheet

The second lesson further explored the tenets of Islam. (DE 62-45 at 2.) Ms. Jakowski presented a second PowerPoint to the class that provided an overview of Islam's major characteristics and its five pillars, "the five obligations that every Muslim must satisfy in order to live a good and responsible life according to Islam." (*Id.* at 11.) As students listened to that lesson, they were given a worksheet that corresponded to the presentation. The worksheet had blanks which students would fill in, or incorrect statements which they would correct, based on information they had learned. (Jakowski Dep. at 40:1–10.) The PowerPoint and worksheet covered a range of topics at a general level: for example, how often Muslims pray, the practice of alms giving, and why Muslims fast. (Worksheet at 3–5; DE 62-45 at 11–20.)

One slide and corresponding page of the worksheet concerned the pillar called *shahadah*, or "Testimony of Faith." (DE 62-45 at 14.) The *shahadah* is described as "[t]he basic statement of the Islamic faith," and the text of the *shahadah* was included in the PowerPoint. (*Id.* at 14.)[8] The worksheet

---

[8]    Hilsenrath contends that the PowerPoint and worksheet also contained a link to a webpage that teaches visitors how to convert to Islam, and claims that students viewed it. (*See* 500 F. Supp. 3d at 280 n.5, SJ Op. at 5 n.5 (referring to Hilsenrath's original brief in support of her motion).) There is indeed a link in both documents to an informational webpage from the BBC describing the *shahadah*. (DE 68-9 at 31, 42.) The webpage states, among other things, that "anyone who cannot recite [the *shahadah*] wholeheartedly is not a Muslim" and "[r]eciting this statement three times

contained an incomplete version of the *shahadah*, and students filled in the underlined blanks of the statement: "There is no god but ____ and _____ is his messenger." (Worksheet at 4, the correct answers being "Allah" and "Muhammed.") C.H. completed part of the worksheet, including the *shahadah* page. (C.H. Dep. at 36:1–9; DE 62-47.)[9]

### (c)   Five Pillars Video

Like the first presentation, the five-pillars presentation contained a link to a video ("Video 2") (DE 62-45 at 10), but Video 2 was not played in class or assigned as homework. (Jakowski Dep. at 36:4–6.) C.H., evidently a diligent student, nevertheless watched it at home with his mother. (C.H. Dep. at 35:23–36:9). Video 2, five minutes long, opens with text stating that "the following is an Islamic educational presentation for primary and secondary schools." (Video 2 at 0:02 (capitalization altered).) Video 2 features two cartoon-animation boys, Alex and Yusuf, discussing Islam. Alex asks Yusuf, who is Muslim, questions about his religion. For example, Alex asks Yusuf when he prays and what Muslims believe. (*Id.* at 0:50–2:00.) Yusuf states that "Allah is the creator of everything." (*Id.* at 1:30–34.) Yusuf then describes the five pillars to Alex and recites the *shahadah*. (*Id.* at 2:00–2:30.) Video 2 concludes with text instructing that the viewer can order more information from the video creator,

---

in front of witnesses is all that anyone need do to become a Muslim." *Shahadah: the statement of faith*, BBC, http://www.bbc.co.uk/religion/religions/islam/practices/shahadah.shtml (last updated Aug. 23, 2009). Other than Hilsenrath's own testimony (DE 63-2 at 129–30), which does not seem to reflect firsthand observations, there is no indication that Ms. Jakowski instructed students to follow links in the PowerPoints at home or that C.H. himself followed any such link. (*E.g.*, Jakowski Dep. at 45:11–19.) As to the worksheet, Ms. Jakowski testified that it was provided in class, presumably in hard copy (*id.* at 40:1–3), and C.H. completed the worksheet by hand, so there is no indication that he would or could have clicked on such a link (C.H. Dep. at 44:23–45:5; *see also* DE 62-47).

[9]   Ms. Jakowski described the worksheet as an in-class assignment. C.H. could not recall whether he completed it at home or in class. (*Compare* Jakowski Dep. at 40:1–10, *with* C.H. Dep. at 45:9–10.) At any rate, it is undisputed that C.H. reviewed the PowerPoint and completed the worksheet as part of the course. (*See id.*)

an organization called Discover Islam, and can organize a mosque tour. (*Id.* at 5:20.) It is clear that Discover Islam is a United Kingdom organization because its website ends in "co.uk," the text of the video uses British spelling, and Yusuf and Alex speak with British accents.

### 2. Hilsenrath's Complaints and Defendants' Response

After watching the videos with C.H. and reviewing the worksheet, Hilsenrath felt that the curriculum favored Islam at the expense of Christianity and Judaism. She sent emails expressing her concerns to (1) Steven Maher, Social Studies Content Supervisor for the School District; (2) Superintendent of Curriculum Karen Chase; (3) Superintendent Michael LaSusa; and (4) the Board of Education of the School District.[10] (DE 62-48; DE 62-50.)

---

[10]  For context, I note the roles and responsibilities of each of these parties:

- Supervisor Maher develops the social studies curriculum and supervises the social studies teachers. (Def. SMF ¶¶ 85–88.)

- Assistant Superintendent Chase is responsible for oversight of the curriculum and Supervisor Maher. (*Id.* ¶ 78.)

- Superintendent LaSusa, under New Jersey law, is the "chief executive" of the District and has the power of "general supervision over all aspects, including . . . instructional programs, of the schools of the district." N.J. Stat. Ann. § 18A:17-20(b); *see also* Def. SMF ¶ 72. He oversees District policy regarding curriculum and course materials, and Assistant Superintendent Chase reports to him. (Weber Dep. at 20:1–21:1, 35:10–15, 54:13–16; La Susa Dep. at 9:22–25.) He also has the responsibility to "ensure that teachers follow" District policy that religion is treated neutrally. (DE 63-15.) Although the Board has the power to hire and fire the superintendent, the Board does not have the power to overrule him on decisions regarding instructional materials and curriculum. (Weber Dep. at 20:1–21:8.) Ultimately, it is his decision to remove materials from courses, a decision that does not require approval from the Board, and his determination is deemed to represent that of the Board and District. (*Id.* at 51:7–14, 57:7–11; LaSusa Dep. at 101:2–102:2.)

- The Board, under New Jersey law, is the "body corporate" that supervises the District. N.J. Stat. Ann. §§ 18A:10-1, 18A:11-1(c)–(d). It consists of nine members and requires five votes to take any action. (Weber Dep. at 34:9–10; *see also* N.J. Stat. Ann. § 18A:10-6.) Nonetheless, the superintendent retains final authority on most day-to-day matters

After sending those emails, Hilsenrath attended a Board meeting in February 2017 and voiced her concerns. (Def. SMF ¶ 186.) In response, the Board's Curriculum Committee convened to discuss those concerns. (*Id.* ¶ 191.) When such complaints are raised, the Committee reviews and researches them and then publicly presents findings and any recommendations to the Board. (Weber Dep. at 19:7–25.) The Board usually does not take formal action regarding Committee recommendations but leaves that to the superintendent. (*Id.* at 20:1–21:8.) Here, the Committee meeting included Superintendent LaSusa, Assistant Superintendent Chase, Supervisor Maher, social studies teacher Stephanie Lukasiewicz, Board Member Michelle Clark, and Board President Jill Weber. (Def. SMF ¶ 195; LaSusa Dep. at 93:25–94:1.)

After reviewing the curriculum and materials, Superintendent LaSusa and the Committee determined that no changes were necessary. They presented their findings at the next Board meeting, emphasizing that the curriculum as a whole aligned with the District policy of religious neutrality. (DE 62-53, at 2–4; DE 62-54, link to video, *passim*; DE 63-5 at 24:1–14.) Prior to the meeting, however, Hilsenrath (and others) appeared on a national television show to voice her concerns. Seemingly in reaction to what they regarded as misstatements on the show and the ensuing disruption, Superintendent LaSusa and Supervisor Maher had the links to the videos removed from the PowerPoints. (*E.g.*, LaSusa Dep. at 87:6–18; DE 63-23 at 3–4 (referring to reports of violent and vulgar communications).)

**B. Procedural History**

Months later, when C.H. was in eighth grade and no longer in the World Cultures and Geography course, Ms. Hilsenrath sued the District, the Board, Superintendent LaSusa, Assistant Superintendent Chase, Principal Jill Gihorski, Supervisor Maher, and the two teachers, Ms. Keown and Ms.

---

involving the schools, including the curriculum, an area which the Board avoids. (Weber Dep. at 21:4–8.)

Jakowski. (Compl. ¶¶ 12–39.) Her claims against the individual defendants name them in their official capacities only. (*Id.* at 2.) She alleges a single claim under 42 U.S.C. § 1983: that the curriculum, with particular focus on the videos and worksheet, violates the Establishment Clause of the First Amendment to the United States Constitution. (*Id.* ¶¶ 99–116.) She seeks (1) an injunction prohibiting Defendants "from funding and implementing religious instruction that endorses Islam or that favors Islam," (2) a declaration that Defendants violated the rights of herself and C.H. under the Establishment Clause, (3) a declaration that Defendants' "training, supervision, policies, practices, customs, and procedures that promote Islam violate the Establishment Clause," (4) nominal damages, and (5) attorney's fees. (*Id.*, Prayer for Relief.)

Defendants moved to dismiss the complaint. I denied that motion, holding that the Complaint on its face sufficiently alleged an Establishment Clause claim. *Hilsenrath on behalf of C.H. v. Sch. Dist. of Chathams*, Civ. No. 18-966, 2018 WL 2980392, at *3–4 (D.N.J. June 13, 2018). Following discovery, the parties cross-moved for summary judgment. (DE 62, 63.) On November 12, 2020, I granted Defendants' motion for summary judgment, denied Hilsenrath's motion for summary judgment, and dismissed Hilsenrath's Complaint. *See* SJ Op., 500 F. Supp. 3d 272 (D.N.J. 2020). Hilsenrath appealed. On July 20, 2022, the Third Circuit vacated the judgment without reaching the merits as such; rather it remanded the case to this Court "for further consideration in light of the Supreme Court's opinion in *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (June 27, 2022)," which had been decided in the interim, while the appeal was pending. *See Hilsenrath on behalf of C.H. v. Sch. Dist. of Chathams*, No. 20-3474, 2022 WL 2913754, at *1 (3d Cir. July 20, 2022). I then ordered supplemental briefing on the issues raised by the Third Circuit's remand (DE 90), and the parties submitted briefs accordingly (DE 99, 100).

Having considered the parties' supplemental submissions, I am now prepared to rule again on the parties' motions as directed by the Third Circuit.

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." I incorporate from my prior opinion the remaining discussion of the legal standards governing motions and cross-motions for summary judgment. SJ Op. 10–11, 500 F. Supp. 3d at 282–83.

## III.  DISCUSSION

The sole issue before the Court concerns Ms. Hilsenrath's Establishment Clause claim for nominal damages.[11] In accordance with the Third Circuit's directive remanding this case "for further consideration in light of the Supreme Court's opinion in *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (June 27, 2022)" (DE 87), I now revisit the parties' cross-motions for summary judgment. I begin my discussion with a brief summary of the *Kennedy* case and its bearing on the Establishment Clause challenge here. (Section III.A.) I then proceed to reanalyze the parties' motions consistent with that decision. (Section III.B.)

### A.  The *Kennedy* Opinion

In *Kennedy*, the Supreme Court considered an appeal by a part time football coach, Joseph Kennedy, who claimed that he lost his job with the Bremerton School District for "kneel[ing] at midfield after games to offer a quiet prayer of thanks," or for leading "pregame or postgame prayers in the locker

---

[11]     The first three of my four original holdings are not implicated by *Kennedy* and therefore remain intact. *See* pp. 1–2, *supra.*

    This case having been narrowed to a pure Establishment Clause claim, I also do not analyze any other constitutional claim, *e.g.,* violation of Fourteenth Amendment guarantees of substantive due process. *See generally Troxel v. Granville*, 530 U.S. 57 (2000); *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 185 (3d Cir. 2005); *Gruenke v. Seip*, 225 F.3d 290, 303–04 (3d Cir. 2000).

room." *Kennedy*, 142 S. Ct. at 2415–16. Kennedy sued in federal court, alleging that the school district had violated the First Amendment's Free Speech and Free Exercise Clauses. *Id.* at 2416. The Supreme Court found that Kennedy had discharged his initial burden to go forward with his free speech and free exercise claims. *Id.* at 2422–23. The burden thus shifted to the school district to demonstrate that its actions were justified. *Id.* at 2426.[12] Relevant here are the majority's holdings with respect to the justification proffered by the school district that "its suspension of Mr. Kennedy was essential to avoid a violation of the Establishment Clause." *Id.* The majority in *Kennedy* rejected this justification and, in so doing, rejected the so-called "*Lemon* test."[13] In fact, the majority suggested that the Supreme Court had *already* impliedly abandoned *Lemon* and "instructed that the Establishment Clause must [instead] be interpreted by 'reference to historical practices and understandings.'" *Id.* at 2428 (citing *Town of Greece, N.Y. v. Galloway*, 572 U.S. 565, 576 (2014); *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2087 (2019) (plurality opinion)). The majority continued:

> "'[T]he line'" that courts and governments "must draw between the permissible and the impermissible" has to "'accor[d] with history and faithfully reflec[t] the understanding of the Founding Fathers.'" *Town of Greece*, 572 U.S. at 577, 134 S.Ct. 1811 (quoting *School*

---

[12]    I do not dwell on distinctions between the particular burdens associated with proving Free Exercise and Free Speech claims. The Court ruled that "[w]hether one views [Kennedy's] case through the lens of the Free Exercise or Free Speech Clause," Kennedy successfully discharged that initial burden, and that therefore "the burden shift[ed] to the District." *Kennedy*, 142 S. Ct. at 2426.

[13]    The reference is to *Lemon v. Kurtzman*, 403 U.S. 602 (1971). *Lemon* imposed a three-part inquiry for analyzing Establishment Clause claims, asking (1) whether the government practice had a secular purpose; (2) whether its "principal or primary effect" advanced or inhibited religion; and (3) whether it created "an excessive government entanglement with religion." *Id.* at 612–13.

In my prior decision, I applied the now-abandoned *Lemon* test to analyze Hilsenrath's Establishment Clause claim. In doing so, I cited then-current Third Circuit law noting that *Lemon* had been eroded in many respects, but maintained its vitality in the area of public education. SJ Op. at 21, 500 F. Supp. 3d at 289–90.

*Dist. of Abington Township v. Schempp*, 374 U.S. 203, 294, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring)). An analysis focused on original meaning and history, this Court has stressed, has long represented the rule rather than some "'exception'" within the "Court's Establishment Clause jurisprudence." 572 U.S. at 575.

*Id.* at 2428 (additional citations omitted).

While clearly rejecting the *Lemon* test, the majority in *Kennedy* was less clear about what would replace it—*i.e.*, what would constitute a proper "historical analysis" of a party's Establishment Clause claim in all cases. Nevertheless, the majority did lay down certain markers which I take as a guide for this Court's analysis of these motions.

The most prominent of those markers is the majority's emphasis on the presence, or not, of coercion: "[T]his Court has long held that government may not, consistent with a historically sensitive understanding of the Establishment Clause, 'make a religious observance compulsory.'" *Id.* at 2429 (quoting *Zorach v. Clauson*, 343 U.S. 306, 314 (1952)). The majority emphasized that "coercion along these lines was among the foremost hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." *Id.*

Further guidance as to what other facts might constitute "hallmarks" of an Establishment Clause violation may be found at the *Kennedy* majority decision footnote 5. That footnote has been described, plausibly in my view, as a "cipher for interpreting how the Court interprets the Establishment Clause by reference to history and tradition." Daniel L. Chen, *Kennedy v. Bremerton School District: The Final Demise of Lemon and the Future of the Establishment Clause*, 21 Harvard J. L. & Pub. Policy Per Curiam, 9 (Summer 2022). Most helpful is that footnote's reference to a portion of Justice Gorsuch's concurrence in *Shurtleff v. City of Boston, Massachusetts,* in which he reviews "our constitutional history [for] some helpful hallmarks that localities and lower courts can rely on." 596 U.S. 243, 285 (2022) (Gorsuch, J., concurring). There, Justice Gorsuch wrote that "[b]eyond a formal declaration that a religious

13

denomination was in fact the established church, . . . founding-era religious establishments often bore certain other telling traits," including (1) "the government exerted control over the doctrine and personnel of the established church;" (2) "the government mandated attendance in the established church and punished people for failing to participate;" (3) "the government punished dissenting churches and individuals for their religious exercise;" (4) "the government restricted political participation by dissenters;" (5) "the government provided financial support for the established church, often in a way that preferred the established denomination over other churches;" and (6) "the government used the established church to carry out certain civil functions, often by giving the established church a monopoly over a specific function." *Id.*[14] At least four of these contain a strong element of compulsion, corroborating the primacy of coercion in the Court's analysis.

To evaluate an Establishment Clause claim in a manner that is "consistent with a historically sensitive understanding of the Establishment Clause," then, I must determine whether Hilsenrath's case bears the

---

[14]   In his concurring opinion in *Shurtleff*, Justice Gorsuch cited to and adopted the position of Professor Michael McConnell when he enumerated these six hallmarks of founding-era religious establishments. *See Shurtleff v. City of Bos., Massachusetts*, 596 U.S. 243, 285–86(2022) (citing Michael W. McConnell, Establishment and Disestablishment at the Founding, Part I: Establishment of Religion, 44 William & Mary L. Rev. 2105 (2003)). Underscoring the Court's adoption of these hallmarks as the guiding principles for Establishment Clause jurisprudence, footnote 5 of the majority opinion in *Kennedy* also cites directly to Professor McConnell's scholarship. *See Kennedy*, 142 S. Ct. at 2429 n.5 (citing same).

Footnote 5 of the majority opinion in *Kennedy* includes two additional citations, both of which refer to sources that elaborate further on the element of coercion. One citation is to a section of Justice Scalia's dissent in *Lee v. Weisman* in which he explains that one of the "hallmark[s] of historical establishments of religion was coercion of religious orthodoxy and of financial support *by force of law and threat of penalty*," 505 U.S. 577, 640–642 (1992) (Scalia, J., dissenting) (emphasis in original), and the other citation refers to a record of statement by James Madison in the Annals of Congress explaining that the First Amendment is aimed to prevent one or multiple sects from "establish[ing] a religion to which they would compel others to conform," 1 Annals of Cong. 730–731 (1789).

"hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." *Kennedy*, 142 S. Ct. at 2429. I now proceed to apply those principles to the summary judgment motions currently before the Court.

### B. The Summary Judgment Motions on Remand

As directed by the Third Circuit, I reanalyze Hilsenrath's Establishment Clause claim for nominal damages, not under the *Lemon* test, but under the approach announced recently in *Kennedy*.

I begin with some general observations. Lurking behind the Supreme Court's analysis is the well-recognized tradeoff between the First Amendment Establishment Clause and Free Exercise Clause in particular cases. *See generally Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005) (these two Clauses, while "express[ing] complementary values," will "often exert conflicting pressures"); *Locke v. Davey*, 540 U.S. 712, 718 (2004) (describing the Clauses as "frequently in tension"). Any attempt to expand the scope of religious free exercise in the context of public institutions tends to be met by a corresponding objection that the state is threatening to establish a particular religion. Thus, in *Kennedy,* the coach argued that a school district's restrictions on his prayers would interfere with his religious observances under the Free Exercise Clause; the school district replied that its hands were tied by the Establishment Clause, under which it could not permissibly endorse the coach's religious observances or force others to participate in them. The *Kennedy* Court, however, found this to be a "false choice," because at least on the facts of that case, these two constitutional commands were not "at odds." 142 S. Ct. at 2432. Because students and other observers were (to varying degrees) exposed to the coach's prayers, but not coerced to participate in them, there arose "no conflict between the constitutional commands" of the Establishment Clause and the Free Exercise Clause. *Id.* In short, the facts "did not come close to crossing any line one might imagine separating protected private expression from impermissible government coercion." *Id.* at 2429.

In a very general sense, *Kennedy* may be seen as restricting the scope of the Establishment Clause and, in the name of Free Exercise, granting a bit more leeway for the presence of religion in the setting of public education. Under the prior *Lemon* test, a practice might have been found impermissible if it lacked a "secular purpose," "advance[d]" religion, or resulted in excessive "entanglement" of government and religion. *Kennedy* emphasizes official coercion and tradition, a test which will often set a higher threshold for an Establishment Clause challenge.[15]

*Kennedy* is not, however, legally or factually on point with our case. To begin with, there is no countervailing Free Exercise issue in our case that resembles the one in *Kennedy*; no coaches, faculty members, or even students are claiming that the authorities punished them for practicing their religion on school property. So in remanding, the Third Circuit surely was not saying that *Kennedy* is directly on point, but rather was responding to this Court's application of the *Lemon* test, which *Kennedy* has now declared to have been superseded.

Ms. Hilsenrath's is a pure Establishment Clause claim. Therefore, I eschew the now-superseded *Lemon* test and, gleaning what guidance I can find from *Kennedy,* I will analyze whether the challenged materials from C.H.'s World Cultures and Geography course bear any of the historical "hallmarks of religious establishments." *Id.* at 2407 n.5. As before, I analyze the challenged materials as a whole and in the context of the curriculum. *See, e.g., Cnty. of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 597 (1989), *abrogated on other grounds by Town of Greece*, 572 U.S. 565. Nothing about *Kennedy* undermines the principle that context remains critical, or vitiates the warning that to "[f]ocus *exclusively* on the religious component of any activity would inevitably lead to [the activity's] invalidation." *Lynch v. Donnelly*, 465

---

[15]     That is not to say that the considerations underlying the *Lemon* test have become irrelevant; far from it. *Kennedy* makes it clear, however, that the legal test has changed.

U.S. 668, 679–80 (1984) (emphasis added); *see also Wood v. Arnold*, 915 F.3d 308, 314 (4th Cir. 2019) ("[C]ourts . . . consistently have examined the entire context surrounding the challenged practice, rather than only reviewing the contested portion." (collecting cases from the Fourth, Fifth, Sixth, Seventh, Ninth, and Eleventh Circuits)), *cert. denied*, 140 S. Ct. 399 (2019).

I first consider whether the challenged World Cultures and Geography curriculum and materials were coercive. The *Kennedy* Court recognized coercion to be "among the foremost hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." 142 S. Ct. at 2429. After reviewing the parties' submissions, I find that the record contains no evidence of significant coercion.[16]

To begin with, C.H. expressly testified that he never felt coerced. In fact, C.H. (correctly, in the District's view) perceived the purpose and effect of the lessons as being to educate students about world religions and the importance of avoiding group generalizations. (C.H. Dep. at 24:18–25:1, 40:8–24, 41:22–25.) Nor did any other student testify that he or she experienced the course materials as coercive. In short, direct, subjective evidence of coercion is lacking.

---

[16] The analysis here is hampered somewhat by the *Kennedy* Court's having found it unnecessary to define "what exactly qualifies as impermissible coercion in light of the original meaning of the Establishment Clause." *Kennedy*, 142 S. Ct. at 2429. Precision may not be required, however; here, as in *Kennedy,* the challenged curriculum and materials, however repugnant to any individual's sectarian religious beliefs, "did not come close to crossing any line one might imagine separating [secular public education] from impermissible government coercion." *Id.* Unless and until the Third Circuit holds to the contrary, I continue to be guided by its mandate, which I take to be consistent with *Kennedy*, that the reviewing court "look[] at whether the government is coerc[ing] anyone to support or participate in religion or its exercise." *Borden v. Sch. Dist. of Twp. of E. Brunswick*, 523 F.3d 153, 175 n.18. (3d Cir. 2008) (citation omitted); *see also C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d at 187. While the students here were exposed to religious materials, there is no testimony from any individual that he or she experienced pressure to support or participate in the practice of any religion.

Even through an objective lens, however, the materials cannot be viewed as tending to compel a student "by force of law and threat of penalty," to adhere to a particular religious belief or participate in a particular religious practice. *Lee v. Weisman*, 505 U.S. at 640–42 (Scalia, J., dissenting). For the reasons expressed in my prior Opinion, I adhere to my conclusion that "Video 1 was used to introduce students to the tenets of Islam . . . [and] Video 2 likewise explored Islam through a neutral question-and-answer format that could not be regarded as proselytizing." SJ. Op. at 23, 500 F. Supp. 3d at 291. And while "the worksheet contained fill-in-the-blanks questions, as is typical at the middle-school level[,] . . . [t]he format fell well short of compelled recitation of a prayer," as the worksheet was "clearly designed to assess the students' understanding of the lesson on Islam," not to inveigle them into praying. *Id.* (citation and quotation omitted). Now of course there is a baseline level of coercion in all public education, irrespective of the subject matter.[17] The coercion relevant here, however, would be coerced participation in or adherence to a religious belief or practice. The educational units at issue, while exposing students to the tenets of religious faiths in various regions of the world, did not require or coerce students "to *support* or *participate* in" the religious faith covered by that unit. *Borden*, 523 F.3d at 175 n.18. (3d Cir. 2008) (emphasis added). Reasonable students, teachers, and parents would understand that the school's mission here was pedagogical, even if these course units exposed students to world religions whose adherents engage in proselytization. My prior observation on that point, although phrased in terms of the *Lemon* test, remains valid. *See* SJ Op. at 23, 500 F. Supp. 3d at 291 ("Of course, the statements of a religion's adherents have a religious purpose, *in the mouths of*

---

[17]     For example, students are required to attend school from the ages of 6 to 16, https://nj.gov/education/safety/sandp/attendance (citing N.J. Stat. Ann. §§ 18A:38-28 through 31) (last visited Sept. 25, 2023), and their completion of assignments is enforced by the grading system. I note in passing that the Board apparently had a policy permitting students to be excused from any part of instruction which the student or parent finds morally, conscientiously, or religiously offensive. (Def. SMF ¶ 38.)

*those adherents*. But for secular educators to teach and study *about* such statements is not to espouse them, or to proselytize.").[18]

The all-important context here is that this unit was part of a comprehensive curriculum on world cultures, which necessarily included units about the predominant religions in the particular area of the world being studied. Religion was not taught as revealed truth, but rather as an important fact about the world. *Kennedy* itself only reinforces the view, expressed at more length in my prior opinion, that *exposure* to a variety of viewpoints, including religious ones, is a proper goal. That goal is not undermined, and indeed may be enhanced, by non-coercive exposure to opposing beliefs. *See Kennedy*, 142 S. Ct. at 2431 (any rule suppressing coach's religious expression "would undermine a long constitutional tradition under which learning how to tolerate diverse expressive activities has always been 'part of learning how to live in a pluralistic society.'").[19]

In her brief, Hilsenrath does not meaningfully address the Third Circuit's mandate on remand, but for the most part hews to her prior general argument

---

[18]     The following observations from my prior Opinion, although presented in the context of the *Lemon* "endorsement" test, remain valid to my point here that the curriculum was educational, not coercive:

> Although the video-creator can be perceived as believing those tenets, neither the lesson, Ms. Jakowski, nor even the video-creator invites or encourages the students to adopt those views. This is par for the course; to take the Ninth Circuit's cogent example, "Luther's 'Ninety-Nine Theses' are hardly balanced or objective, yet their pronounced and even vehement bias does not prevent their study in a history class's exploration of the Protestant Reformation, nor is Protestantism itself 'advanced' thereby." [*Brown v. Woodland Joint Unified Sch. Dist.*, 27 F.3d 1373, 1380 (9th Cir. 1994)]. When, as here, religious beliefs are presented to educate, not convert, students, there is no endorsement of religion.

SJ. Op. at 25–26, 500 F. Supp. 3d at 292.

[19]     The prior Opinion's discussion of the curriculum's secular purpose, primary effect, and entanglement, although keyed to the *Lemon* test, is highly pertinent and more comprehensive than the discussion here. SJ Op. at 21–29, 500 F. Supp. 3d at 290–95. It should be read in conjunction with this Opinion.

that it is a violation of the Establishment Clause for a public school "to proselytize or to favor any one religion over others." (Pl. Br. at 7.) Whatever its legal merits, that argument fails on the facts, and has only grown weaker in light of *Kennedy*'s newfound emphasis on coercion. *Kennedy,* in my view, does not undermine the case law cited in my prior Opinion, at least insofar as it applies to this fact pattern. *See* SJ Op. at 21–29, 500 F. Supp. 3d at 289–95.

The findings of undisputed fact in my prior Opinion dispel any notion that the World Cultures and Geography course promoted Islam at the expense of other religions. The evidence, I found, demonstrates that "the curriculum treats Islam equally with other religions. It is not a standalone course of study, but is part of a larger survey of world regions and religions." SJ Op. at 24, 500 F. Supp. 3d at 291. Thus "the World Cultures course includes similar units on, for example, Hinduism and Buddhism, in which students watch videos on those religions to understand their tenets and practices." *Id.* (citing DE 62-39 at 4, 8–11; DE 68-8). I also rejected Hilsenrath's argument that "because the videos on Hinduism and Buddhism are from the perspective of a more neutral narrator, the World Cultures course does not treat all religions equally and proselytizes when it comes to Islam." *Id.* at 25 n.14. The reader is referred to the Court's discussion of these arguments in the prior summary judgment Opinion.

By focusing on these prior arguments, Hilsenrath fails to grapple with the task placed before the Court by the mandate of the Third Circuit, *i.e.*, to set aside the old *Lemon* test and revisit the case in light of the largely coercion-based standard adopted by the majority in *Kennedy.*

The World Cultures and Geography curriculum and materials do not present any of the "hallmarks" associated with establishment of religion to which *Kennedy* alluded. There is no evidence that by assigning middle school students activities and homework regarding various religions and cultures, the Board "exerted control over the doctrine and personnel of [an] established church," "mandated attendance in [an] established church and punished

20

people for failing to participate," "punished dissenting churches and individuals for their religious exercise," "restricted political participation by dissenters," "provided financial support for [an] established church," or "used the established church to carry out . . . civil functions." *Shurtleff*, 596 U.S. at 286 (Gorsuch, J., concurring). These, the sole guides that *Kennedy* has furnished the lower courts for the assessment of "coercion" for purposes of an Establishment Clause challenge in the context of public education, do not fit the facts of our case.

*   *   *

In sum, the curriculum and materials here were not coercive and do not otherwise bear or resemble the "hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." Accordingly, the Board did not violate the Establishment Clause. I will enter summary judgment in the Board's favor on Hilsenrath's remaining nominal-damages claim.

## IV.   CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment, reconsidered on remand with the benefit of additional briefing, is **GRANTED**, and Hilsenrath's motion for summary judgment is **DENIED**.

An appropriate order follows.

Dated: October 16, 2023

/s/ Kevin McNulty

_____

**Hon. Kevin McNulty**
**United States District Judge**